# In the United States Court of Federal Claims

No. 17-1968C
(Filed:  July 27, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| PLANATE MANAGEMENT GROUP, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

Contract Disputes Act; Request for
Equitable Adjustment; Changed
Conditions; Motion to Dismiss in Part;
Motion to Merge Counts; Claims
Submitted to the Contracting Officer; Same
Operative Facts; Same Relief Available

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Ryan C. Berry, Washington, DC, for plaintiff.

Sean L. King, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

     In this case, plaintiff Planate Management Group, LLC asserts that the United States Department of the Army Expeditionary Contracting Command ("Army") breached a contract to provide professional support services throughout Afghanistan by failing to reimburse plaintiff for the cost of arming its personnel with personal protection weapons.  Plaintiff pleads five alternative counts for relief, and seeks damages of $84,864.85, attorney's fees, costs, and prejudgment and postjudgment interest.

     Currently before the court is defendant's motion to dismiss Counts III and V of plaintiff's complaint for lack of subject-matter jurisdiction and to merge Counts I and II.  As explained below, the court has jurisdiction to consider each count of plaintiff's complaint, but Count II is duplicative of Count I.  Therefore, the court grants in part and denies in part defendant's motion, and merges Count II into Count I.

## I.  BACKGROUND

     The Army awarded plaintiff contract W91B4M-11-P-4342 on April 3, 2011, to "perform support services [for] the Afghan Air Force [] Development Services . . . on site at Afghan Air Force locations throughout Afghanistan" and thereby increase the military's "capability to technically manage development of the Afghanistan Air Force['s] communications and infrastructure."  Compl. Ex. 1 at 1, 52-53.  Six individuals employed by plaintiff, all holding a

secret-level security clearance, were embedded within the United States Department of Defense 438th Air Expeditionary Wing ("438th AEW") pursuant to the contract.  Compl. Ex. 5 at 1.  The firm-fixed-price contract provided for a base year from April 6, 2011, through April 5, 2012, and four option years.[1]  Compl. Ex. 1 at 53.  The award amount for the base year was $1,268,768.00. Id. at 1.  As embedded contractors, plaintiff's personnel were subject to "[o]rders, directives, and instructions issued by the [United States Central Command] Combatant Commander, including those relating to force protection, security, health, safety, or relations and interactions with local nationals."  Id. at 35.

The Performance Work Statement ("PWS") provided that plaintiff would be engaged in both office and field work.  Id. at 54.  The 438th AEW was responsible for providing transportation for plaintiff's personnel from their main work site at the 438th AEW headquarters in Kabul to other locations.  Id.  Plaintiff's personnel were "expected to provide their own personal protective equipment (individual body armor, helmet, gloves, etc.) and their own cell phones."  Id.  In addition, other than the 438th AEW's responsibility to provide "access to office, classroom, laboratory, and flight line spaces at the [Afghan Air Force] facilities to on-site contractor personnel" and "a desk, computer, network account[,] and office supplies," plaintiff was required to "furnish everything required to perform [the] PWS."  Id. at 55.

The contract provided that changes could be implemented "only by written agreement of the parties."  Federal Acquisition Regulation ("FAR") 52.214-4(c); see also FAR 52.214-4(d) (disputes clause); Compl. Ex. 1 at 1 (incorporating FAR 52.214-4 into the contract).  The contract also included Defense Federal Acquisition Regulation Supplement ("DFARS") 252.225-7040.  See generally Compl. Ex. 1 at 34-40.  Under DFARS 252.225-7040(j)(1), plaintiff's personnel were not allowed to carry weapons unless approved to do so by the combatant commander.  Id. at 38.  Such approval would entail further conditions; specifically, DFARS 252.225-7040(j) provides:

> (1)  If the Contractor requests that its personnel performing in the designated area be authorized to carry weapons, the request shall be made through the Contracting Officer to the Combatant Commander, [who] will determine whether to authorize in-theater Contractor personnel to carry weapons and what weapons and ammunition will be allowed.
>
> (2)  If the Contracting Officer, subject to the approval of the Combatant Commander, authorizes the carrying of weapons—
>
>> (i)  The Contracting Officer may authorize the Contractor to issue Contractor-owned weapons and ammunition to specified employees; or

---

[1]  The Army subsequently exercised each option.  Compl. Ex. 14 at 2.

(ii)  [The 438th AEW] may issue Government-furnished weapons and ammunition to the Contractor for issuance to specified Contractor employees.

(3)  The Contractor shall ensure that its personnel who are authorized to carry weapons—

   (i)  Are adequately trained to carry and use them . . . ;

   (ii)  Are not barred from possession of a firearm by 18 U.S.C. § 922; and

   (iii)  Adhere to all guidance and orders issued by the Combatant Commander regarding possession, use, safety, and accountability of weapons and ammunition.

(4)  Whether or not weapons are Government-furnished, all liability for the use of any weapon by Contractor personnel rests solely with the Contractor and the Contractor employee using such weapon.

(5)  Upon redeployment or revocation by the Combatant Commander of the Contractor's authorization to issue firearms, the Contractor shall ensure that all Government-issued weapons and unexpended ammunition are returned as directed by the Contracting Officer.

Id. at 38-39.

On April 27, 2011, there was an insider attack perpetrated by an Afghan Air Force officer with whom the 438th AEW forces were working, killing eight members of the 438th AEW (including personnel who would have been supported by plaintiff) and one civilian contractor, and injuring several others.  Compl. Ex. 11 at 2; Compl. Ex. 14 at 2.  Plaintiff was informed of this attack in May 2011 during its initial kickoff meeting following contract award.  Compl. Ex. 11 at 2.  Once in theater, the 438th AEW chief of staff allegedly "reiterated his desire for all his contractor personnel to be armed," and the contracting officer's representative "recommended [plaintiff] initiate action to arm [its] staff."  Id.; accord Compl. Exs. 8-9 (reflecting that the 438th AEW chief of staff orally requested plaintiff to arm its personnel but that no written agreement to that effect was signed).

While in theater, plaintiff's personnel lived in a United States-controlled housing complex located approximately 1.5 miles from the 438th AEW headquarters.  Compl. Ex. 5 at 2. The daily commute between their living and work locations involved traveling outside of United States-controlled areas.  Id. at 1.  To perform their work, plaintiff's personnel traveled via ground

or air outside of secure areas to various locations in Afghanistan.  Id. at 1-2.  This travel exposed plaintiff's personnel to "improvised explosive devices (IEDs), vehicle-borne improvised explosive devices (VBIEDs), personnel-borne explosive devices (PBEDs), and potentially hostile small arms (SMARMS) fire."  Id. at 1.  If plaintiff's personnel traveled in vehicles or aircraft that were "shot down or disabled, they [were] required to assist with their defense."[2]  Id.

Throughout 2011, Kabul and the surrounding area experienced "an increase in violent attacks" that was expected to continue.  Id.  On May 14, 2011, the 438th AEW commander issued a force protection directive "[d]ue to increasing threats and recent events."  Compl. Ex. 3.  The directive instituted a mandatory "[t]wo person rule" that required plaintiff's personnel to travel with a "wingman" at all times, imposed a curfew, and restricted travel on the perimeter road of the 438th AEW headquarters compound to armored vehicles.  Id.

Active duty military personnel initially provided the required protection.  Compl. Ex. 12 at 2.  However, despite the deteriorating security situation, plaintiff's personnel did not have military escorts or other security personnel with them at all times.  Id. at 2-3; Compl. Ex. 5 at 2.  Accordingly, plaintiff began discussions with the contracting officer regarding arming its in-theater staff.  Compl. Ex. 7.  On November 1, 2011, the 438th AEW vice commander forwarded a memorandum explaining plaintiff's request for its staff to arm themselves with Beretta M9s "for personal protection only."  Compl. Ex. 5 at 2; see also Compl. Ex. 11 at 3 (listing the specific equipment that plaintiff purports to have subsequently purchased).  He highlighted plaintiff's awareness that its personnel were "non-combatants" and thus were not permitted to "engage in offensive actions," that they were subject to rules regarding the use of force, and that "use of a firearm creates a potential for criminal and civil liability."  Compl. Ex. 5 at 2.

On May 7, 2012, the Army modified plaintiff's contract to exercise the first option year (for April 6, 2012, through April 5, 2013) and to update contract clause 952.225-0011 to include authorized weapons.  Compl. Ex. 6 at 1.  Specifically, clause 952.225-0011, as modified, provided that the 438th AEW would provide each of plaintiff's personnel with an "[a]uthorized [w]eapon" on an "as-available" basis.  Id. at 6-7.  However, the contract modification did not include a line item for plaintiff to procure and manage weapons for its team despite plaintiff's understanding that it would.  Id. at 2-4; Compl. Exs. 7-9.  In other words, plaintiff's personnel were allowed to be armed under the modified contract, but the 438th AEW was only required to provide personal protection weapons if the weapons were available; otherwise, plaintiff would need to furnish the approved weapons.  The May 7, 2012 contract modification increased the award amount by $1,359,136.00, bringing the total amount to $2,627,904.00 through the first two years of the contract.  Compl. Ex. 6 at 4.  The following month, the contracting officer discussed a cap on "in-scope" modifications to the contract.  Compl. Ex. 10 at 1-2.  She expressed a willingness to negotiate a weapons modification that included reimbursement for plaintiff's costs in arming its personnel, but stated that approval from a higher authority was necessary because weapons were not within the scope of the contract.  Id. at 1.

---

[2]  The record does not suggest that plaintiff's personnel ever traveled in a vehicle or aircraft that was shot down or disabled.

The security situation continued to deteriorate during the second year of plaintiff's contract.  In 2012, there were forty-five "so-called insider attacks—Afghan police and troops killing foreign allies" resulting in sixty-one deaths, compared to twenty-one insider attacks resulting in thirty-five coalition deaths during 2011.  Compl. Ex. 11 at 2-3.  On July 30, 2012, the commander of the 438th AEW issued a superseding force protection directive in which he required plaintiff's personnel to have a "guardian angel" at all times on Afghan Air Force bases and installations.  Compl. Ex. 4 at 1.  The "guardian angel" was required to be in "weapon status" and "remain alert and capable of immediate response to hostile threat[s]" at all times  Id.  Unarmed contractors, such as plaintiff's personnel, were not allowed to remain on Afghan Air Force property after armed United States military personnel had departed for the day.  Id. at 2.  All movement outside of secured military compounds was to be treated as "tactical patrol with tactical mindset."  Id.  For safety reasons, personnel traveling outside of secured compounds were also directed not to wear uniforms while in transit.  Id.

In October 2012, plaintiff provided a Beretta M9 and ancillary equipment to each of its in-theater personnel.  Compl. Ex. 11 at 3; Compl. Ex. 14 at 10.  On December 31, 2012, plaintiff submitted a Request for Equitable Adjustment to the contracting officer pursuant to the contract's changes clause.  Compl. Ex. 11 at 1.  Specifically, plaintiff requested an increase to the contract price in the amount of $76,574.00 due to "additional and unexpected cost impacts [plaintiff] incurred as a result of the need for [plaintiff] to provide for the self-defense of its employees," and explained that "the costs incurred to allow [plaintiff's in-theater personnel] to carry M9 weapons are outside the Statement of Work."  Id.  Plaintiff averred that such costs "were not foreseeable prior to contract award" because "weapons were not authorized during original . . . proposal development and no provision for reimbursement of such costs were allowed" in either the original contract or the then-current option year.  Id. at 2.  Plaintiff also noted that contractual requirements to travel to various locations were reasonable but "cannot be expected . . . without adequate self-defense."  Id. at 3.  There is no evidence before the court indicating that the contracting officer responded to plaintiff's request.  Plaintiff submitted a second Request for Equitable Adjustment to the contracting officer, providing the same reasoning verbatim (with the exception of additional language concerning the July 30, 2012 force protection directive and updated costs), on July 9, 2015.  Compare Compl. Ex 12 (July 9, 2015 request), with Compl. Ex. 11 (December 31, 2012 request).  The contracting officer denied plaintiff's second request on October 23, 2015.[3]  Compl. Ex. 14 at 1.

On July 6, 2016, plaintiff submitted a formal claim for $86,864.85 in the form of a Request for Contracting Officer's Final Decision pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109 (2012).  See generally Compl. Ex. 14.  After outlining the sequence of events described above, plaintiff argued:

---

[3]  Although Exhibit 13 to plaintiff's complaint is titled "Copy of the Contracting Officer's Decision in Response to REA Two, October 23, 2015," Exhibit 13 itself is a duplicate of Exhibit 12, which is a copy of the July 9, 2015 Request for Equitable Adjustment.  Compare Compl. Ex. 13, with Compl. Ex. 12.  The actual October 23, 2015 denial letter is not included in the record currently before the court.

[O]n July [30,] 2012, over a year after contract performance commenced, the 438th AEW issued a force protection directive stipulating the "two-person rule" where no active duty nor contractor personnel could travel to unsecured work locations without further protection.  When originally directed, active duty personnel from the [438th AEW] provided this protection.  As the number of active duty personnel was reduced, contractors had to rely on their own personnel for protection to comply with the new force protection directives.

. . . .

. . . [Plaintiff's] personnel were not permitted to carry weapons; accordingly, [plaintiff's] offered price did not include any costs associated with acquiring, transporting, using and managing weapons.

. . . [Plaintiff] was required to comply with any changes in security requirements.  [Plaintiff's] representatives understood this to mean that any change would be a contract change in performance directed by the Contracting Officer's Representative.

. . . .

The change in security posture reflected a changing perception of the true risks associated with the performance of [plaintiff's] contract. . . .

Had the [April 27, 2011] shooting incident happened prior to contract award, the government could have taken proper steps to alert offerors of the true risks and the offerors could have included associated costs in their offers.  As events turned out, however, the incident happened immediately after contract award.

. . . Authorization was finally granted in the form of a Contract Modification, P00012, which authorized the carrying of weapons, but did not provide for a change in contract price to compensate for the same.

. . . .

Constructive Change

The [Army's] understanding of the true nature of the security situation at the contract work locations changed

significantly from the period just preceding the contract award. . . .
The security situation threatened the success of the Command's
mission.  Because the Command did not have sufficient resources
to provide for security itself, it sought higher command
authorization to authorize [plaintiff] self-arming . . . .

. . . .

This change in the risk posture, and the contracting
officer's failure to acknowledge the same, constitutes a
constructive change under the contract.

Mutual Mistake of a Material Fact

. . . The true security risks were not understood by the
government and, therefore, were not reflected in the solicitation
package.  The true risks were not conveyed to the offerors, and
therefore neither assumed nor reflected in their offers.

The true risks are material to successful performance of this
contract.  Neither the 438th AEW nor the embedded [plaintiff]
personnel could properly fulfill their mission without proper
security for their personnel . . . .

Had these true risks been known and disclosed, [plaintiff]
could have built appropriate costs in its offer.

This constitutes a mutual mistake of the contracting parties
requiring an appropriate reformation of the contract and
compensation for [plaintiff].

Id. at 1-5.  Plaintiff then demanded a sum certain in the amount of $84,864.85, provided a cost
narrative, certified its claim, and attached a chart supporting its calculation of the claimed
amount.  Id. at 5-10.

The contracting officer responded on August 1, 2016.  See generally Compl. Ex. 15.  In
denying plaintiff's request, the contracting officer explained:

[Plaintiff's] request to self-arm employees was never coordinated
with a Contracting Officer, was not directed by any government
employee with apparent or actual authority, and was not a
contractual requirement. . . .  [Plaintiff] made no effort to raise the
supposedly "changed" security arrangements with the then-
cognizant Contracting Officer, nor did company management
personnel communicate with any government employee to suggest

-7-

that the purported changes <u>compelled</u> the company to self-arm.  At
no point did [plaintiff] indicate to any of the individuals who
endorsed the request that additional costs associated with self-
arming would be borne by the Government, and . . . many of the
factual assertions regarding the "direction" alleged to have
occurred are lacking documentary support.

 . . . [Y]ou simply reassert that the "changed" security
situation—a "green on blue" shooting, immediately after award—
compelled [plaintiff] to self-arm . . . .  Yet you've provided no
documentation in support of these allegations, and the record that
<u>is</u> available makes clear that the "change" in security posture did
not <u>necessitate</u> self-arming . . . .  Instead, self-arming was initiated
by [plaintiff], for its own convenience, without any coordination
with the only government official with authority to actually change
the contract—the Contracting Officer.

 . . . [Plaintiff] requests that the Contracting Officer
recognize costs that could have been avoided or mitigated had the
issue been properly raised when the issue was still timely.  Because
you've provided no evidence that self-arming of [plaintiff's]
personnel was directed by any government employee with actual
or apparent authority to do so, or that the governmental personnel
who <u>acquiesced</u> in your request did so with the understanding that
self-arming costs would be borne by the government, your claim is
denied in its entirety.

This is the final decision of the contracting officer.  . . .

. . . .

Instead of appealing to the agency board of contract
appeals, you may bring an action directly in the United States
Court of Federal Claims [("Court of Federal Claims")] . . . within
12 months of the date you receive this decision.

<u>Id.</u> at 1-2.  Plaintiff was notified of the contracting officer's final decision on December 20,
2016.[4]  Compl. Ex. 2.

---

[4]  The delay between August 1, 2016 (when the contracting officer issued his final
decision), and December 20, 2016 (when plaintiff was notified of the decision) was due to "an
internal administrative error" within the Army.  Compl. Ex. 2.

On December 18, 2017, plaintiff filed suit in this court to appeal the contracting officer's final decision.  In its complaint, plaintiff asserts five counts for relief:

- Count I—Dispute Under the Contract:  Appeal of Final decision, Compl. ¶¶ 37-46;

- Count II—Breach of Contract, id. ¶¶ 47-55;

- Count III—Breach of Covenant of Good Faith and Fair Dealing, id. ¶¶ 56-61;

- Count IV—Constructive Change, id. ¶¶ 62-65; and

- Count V—Cardinal Change, id. ¶¶ 66-73.

Plaintiff seeks $84,864.85 in damages plus attorney fees, costs, and prejudgment and postjudgment interest.  Id. Prayer for Relief.

Defendant then moved to (1) dismiss Counts III and V of the complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), asserting that those claims were not submitted to the contracting officer; and (2) merge Counts I and II of the complaint, contending that they are based upon the same underlying alleged facts and legal theory.  After filing the instant motion, defendant filed an answer with respect to Counts I, II, and IV, and deferred answering Counts III and V pending the outcome of its motion to dismiss.  In response to defendant's motion, plaintiff asserted that all of its claims were before the contracting officer.  After defendant filed its reply, the court vacated the deadline for the parties to file their Joint Preliminary Status Report pursuant to RCFC Appendix A, Part III pending resolution of the instant motion.  Defendant's motion is fully briefed, and the court deems oral argument unnecessary.

## II.  MOTION TO DISMISS IN PART

### A.  Standard of Review

In ruling on a motion to dismiss for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject-matter jurisdiction.  Id.  If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims.  Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014).  If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

## B. Subject-Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (explaining that subject-matter jurisdiction cannot be forfeited or waived because it "involves a court's power to hear a case"); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999) ("[A] federal court [must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."), quoted in Hymas v. United States, 810 F.3d 1312, 1316-17 (Fed. Cir. 2016); Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject-matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."[5]  Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868).  Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time.  Arbaugh, 546 U.S. at 506.

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the United States Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2012).  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

## C. The Contract Disputes Act

Plaintiff asserts jurisdiction under the CDA, which is a "money-mandating source of law sufficient to confer jurisdiction in [the Court of Federal Claims] under the Tucker Act."  Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 168, 171 (2014); accord 28 U.S.C. § 1491(a)(2) (providing jurisdiction in the Court of Federal Claims to hear disputes arising under the CDA).  The CDA applies to disputes concerning federal government procurement contracts, including contracts for services.  41 U.S.C. § 7102(a)(1); accord Wesleyan Co. v. Harvey, 454

---

[5]  Because subject-matter jurisdiction involves the court's "power to hear a case," Arbaugh, 546 U.S. at 514, courts cannot ignore jurisdictional limitations even to pursue laudable aims.  Therefore, plaintiff's arguments in opposition to defendant's motion to dismiss that invoke judicial economy are unavailing.

F.3d 1375, 1378 (Fed. Cir. 2006) (defining "procurement" as the "acquisition by purchase, lease or barter, of property or services for the <u>direct benefit or use</u> of the Federal Government" (internal quotation marks omitted)).

Under the CDA, jurisdiction in the Court of Federal Claims "requires both that a claim meeting certain requirements [has] been submitted to the relevant contracting officer and that the contracting officer [has] issued a final decision on that claim." <u>K-Con Bldg. Sys., Inc. v. United States</u>, 778 F.3d 1000, 1005 (Fed. Cir. 2015); <u>accord</u> <u>Northrop Grumman Computing Sys., Inc. v. United States</u>, 709 F.3d 1107, 1112 (Fed. Cir. 2013) ("If a purported claim is found to be insufficient for any reason, the insufficiency is fatal to jurisdiction under the CDA."); <u>see also</u> 41 U.S.C. § 7103 (setting forth the requirements for submitting claims to the contracting officer). The claim must provide the contracting officer with adequate notice of the basis and amount of the request, <u>K-Con Bldg. Sys.</u>, 778 F.3d at 1005-06, such that the contracting officer has "an ample pre-suit opportunity to rule" thereon, <u>id.</u> at 1006.  The contracting officer's decision must be rendered in accordance with the procedural and substantive requirements set forth in 41 U.S.C. § 7103(a)(3), (d)-(f).  In addition, the court only has "jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision." <u>K-Con Bldg. Sys.</u>, 778 F.3d at 1005 (internal quotation marks omitted); <u>accord</u> 41 U.S.C. § 7104; <u>Arctic Slope Native Ass'n v. Sebelius</u>, 583 F.3d 785, 793 (Fed. Cir. 2009) ("[T]he timely submission of a claim to a contracting officer is a necessary predicate to the exercise of jurisdiction by a court . . . over a contract dispute governed by the CDA.").

Further, the court possesses jurisdiction to entertain a claim set forth in a complaint only if that same claim was first presented to the contracting officer.  <u>See</u> <u>Kellogg Brown</u>, 115 Fed. Cl. at 183 ("[T]he law is clear that 'the same claim must be presented to the Court of Federal Claims as was decided by the contracting officer.'" (quoting <u>Ace Constructors, Inc. v. United States</u>, 499 F.3d 1357, 1361 (Fed. Cir. 2007))).

The parties do not dispute that the contract is governed by the CDA, that plaintiff timely submitted a certified claim to the contracting officer, and that this action was timely filed after the claim was denied.[6]  Therefore, to resolve defendant's motion to dismiss in part, the court's task is limited to determining whether Counts III and V as set forth in plaintiff's complaint were first presented to the contracting officer.

---

[6]  A suit that is filed in the Court of Federal Claims "within 12 months from the <u>date of receipt</u> of a contracting officer's decision" is timely.  41 U.S.C. § 7104(b)(3) (emphasis added). Therefore, plaintiff's complaint is timely because it was filed less than one year after plaintiff received the contracting officer's final decision.

**D. Plaintiff Submitted the Claims in Counts III and V to the Contracting Officer**

Claims asserted in the Court of Federal Claims that "arise from the same operative facts" and seek "essentially the same relief" will be deemed to be the same claims as those previously submitted to the contracting officer, even if "differing legal theories for that recovery" are presented or the claims are not presented using the "exact language or structure of the original administrative CDA claim." Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

While simply adjusting the amount of damages based on the evidence developed during litigation does not create a separate claim, courts have "differentiated claims seeking different types of remedy, such as expectation damages versus consequential damages." Id. Similarly, a "materially different" fact pattern "create[s] a different claim," whereas "merely adding factual details or legal argumentation does not create a different claim." Id. In other words, demands should be treated as separate claims "if they either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally." Id. at 1005. The court must evaluate whether jurisdiction lies for each separate claim, rather than the entire case as a whole.[7] Id.

**1. Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiff asserts, in Count III of its complaint, that the Army breached the covenant of good faith and fair dealing. See generally Compl. ¶¶ 56-61. The "implied duty of good faith and fair dealing" is also referred to as the "implied duty not to hinder and the implied duty to cooperate." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 827 (Fed. Cir. 2010). Plaintiff avers that the Army "had an obligation to render reasonable cooperation to [plaintiff] in the performance of the Contract, as well as an obligation not to unreasonably hinder Contract performance." Compl. ¶ 57. Specifically, plaintiff alleges that the Army "breached its obligation of good faith and fair dealing by requiring [plaintiff] to arm its personnel for personal protection and then failing to reimburse [plaintiff] for the costs of such personal protection," id. ¶ 58, and by "requiring [plaintiff] to arm its personnel and subsequently refusing to compensate [plaintiff] for the costs, delays, and inefficiencies associated with the [Army's] unreasonable administration of the Contract modification," id. ¶ 59. Defendant avers that plaintiff's "claim in Count III for breach of the duty of good faith and fair dealing involves an 'entirely distinct' legal theory—with different elements of proof and underlying evidence—than the constructive change and mutual mistake claims it presented to the contracting officer." Def.'s Mot. Dismiss in Part & Merge Counts ("Def.'s Mot.") 7. Defendant explains that, in the certified claim plaintiff presented to the contracting officer, plaintiff "did not discuss any intended benefits under the contract that the [Army] attempted to reappropriate nor did [plaintiff] claim that the [Army] interfered with [plaintiff's] contractual performance." Id. at 8.

---

[7] The parties do not dispute that the allegations contained in Counts I, II, and IV were before the contracting officer, and the court agrees that they were. Therefore, the court has jurisdiction to consider the allegations set forth in Counts I, II, and IV of plaintiff's complaint.

In its certified claim, plaintiff highlighted the July 30, 2012 force protection directive requiring its personnel to travel with armed personnel in weapon-ready status, noted that it was required to comply with force protection directives, and remarked that, because the 438th AEW did not always have active duty personnel available to provide armed escorts, it was required to arm its own personnel to comply with the force protection directive.  Therefore, plaintiff's assertions that the 438th AEW required plaintiff to arm its personnel were indeed before the contracting officer.

Plaintiff also explicitly referred, in its certified claim, to (1) the contracting officer's October 23, 2015 denial of its Request for Equitable Adjustment in which plaintiff sought reimbursement for the costs of arming its personnel and (2) the May 7, 2012 contract modification in which plaintiff received authorization to arm its personnel but not the funds to do so.  Therefore, plaintiff's contention that defendant did not—by failure and later outright refusal—compensate plaintiff for arming its personnel was before the contracting officer.

The duty (or covenant) of good faith and fair dealing "is inherent in every contract." Precision Pine, 596 F.3d at 828.  This duty requires each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party."  Metcalf Constr. Co. v. United States, 742 F.3d 984, 991 (Fed. Cir. 2014) (internal quotation marks omitted).  Although plaintiff did not specifically articulate a breach of the covenant of good faith and fair dealing in its certified claim, the factual recitations therein described the Army's alleged failure to engage in reasonable contract administration.

In short, the allegations in Count III of plaintiff's complaint were before the contracting officer when he made his final decision that plaintiff challenges in this court.

## 2.  Cardinal Change

In Count V of its complaint, plaintiff argues that the changed security situation amounted to a cardinal change.  See generally Compl. ¶¶ 66-73.  Specifically, plaintiff avers that the "change in security posture [and] change in working environment . . . were outside the scope of the original agreement and Contract," id. ¶ 68; such changes "significantly changed the security posture, working environment, and thus the costs associated with security," id. ¶ 69; the changes "directed by the Defendant were beyond the scope of the contract and fundamentally altered [plaintiff's] contractual undertaking," id. ¶ 70; and therefore "the cost of work performed was drastically changed from the cost of work [plaintiff] bid to perform," id. ¶ 71.  Defendant posits that, in the certified claim plaintiff presented to the contracting officer, plaintiff "did not discuss an important aspect of a cardinal change; that the change be 'materially different' from what is bargained for in the contract."  Def.'s Mot. 8.

In its certified claim, plaintiff discussed the change in risk posture; noted that, at the beginning of contract performance, the 438th AEW chief of staff advised plaintiff to arm its personnel; and described the increased costs it incurred to arm its personnel.

In short, the allegations in Count V of plaintiff's complaint were before the contracting officer when he made his final decision that plaintiff challenges in this court.

### E.  Summary

Plaintiff's certified claim put the contracting officer on notice of the basis of the claims that it later set forth in Counts III and V of its complaint, such that the contracting officer was able to render a decision on the claims now before the court.  In other words, Counts III and V of plaintiff's complaint are based on the same operative facts that were before the contracting officer.  Therefore, this court has jurisdiction to consider the allegations contained in Counts III and V of plaintiff's complaint, and must deny defendant's motion to the extent it seeks dismissal of these counts.[8]

## III.  MOTION TO MERGE COUNTS

In addition to asking the court to dismiss Counts III and V of the complaint, defendant asks the court to merge Counts I and II because "they are largely based on the same underlying allegations and legal theory."[9]  Id. at 9.  Plaintiff does not dispute that the court has the power to merge counts, but contends that, in Count II of its complaint, it "assert[s] a separate [and] distinct claim for breach of contract, and that [Count II] is not merely a variation on Count I."  Pl.'s Opp'n Def.'s Mot. 8.

Two or more counts in a complaint may be merged when they contain the same factual allegations and request the same relief.  See RCFC 8(e) ("Pleadings must be construed so as to do justice."); RCFC 12(f) (allowing the court to strike any "redundant" or "immaterial" matter from a pleading).  In Aptus Company v. United States, for example, another judge of this court merged multiple counts in a contract action in which the "factual averments [were] identical" and the relief that could be awarded if the plaintiff was successful was also identical.  61 Fed. Cl. 638, 644-45 (2004), aff'd sub nom. Lin v. United States, 159 F. App'x 186 (Fed. Cir. 2005) (unpublished decision).  The court explained that labeling a claim differently "does not alter its fundamental nature," and with respect to a "duplicative[] and redundant statement . . . , the facts alleged therein [were] also merged into, and subsumed by," another count.  Id. at 646.  Other courts have also merged counts when the claims asserted therein are "based on the same underlying allegations and theory."  Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1310 (11th Cir. 2000).

---

[8]  The court only considers whether it has jurisdiction to consider the factual allegations set forth in plaintiff's complaint.  Whether plaintiff has plausible claims for breach of the covenant of good faith and fair dealing and for cardinal change is not an issue presently before the court.

[9]  The court only considers defendant's request to merge Count II into Count I. Defendant does not move to merge Count III into Count I or Count V into Count IV.

Plaintiff seeks an award of $84,864.85 in damages under the theories articulated in each of the five counts set forth in its complaint.  In other words, the relief requested under each count is the same.  Accordingly, the merger inquiry depends on whether the factual allegations in each count are the same as those in another count.

The crux of Count I of plaintiff's complaint is recited in paragraphs 39 and 40 therein:

> 39.  Under the terms of the Contract, [plaintiff] is entitled to payment for any changes in the Work scope or means or methods of performance and is further entitled to an equitable adjustment for the cost of such changes, including, without limitation, costs expended.

> 40.  The Defendant failed to provide such compensation for the changes, both directed and constructive, and for such changes in condition [and] means and methods of performance.

Similarly, the crux of Count II of plaintiff's complaint is recited in paragraphs 49 and 51 therein:

> 49.  Under the terms of the Contract, [plaintiff] is entitled to payment for any changes of the work scope or means or methods of performance and government-furnished services and equipment and is further entitled to an equitable adjustment for the cost of such changes including, without limitation, costs expended.

> . . . .

> 51.  The Defendant failed to provide compensation for such changes, both directed and constructive, and for such changes in conditions, means and methods of performance, and schedule.

The "government-furnished services and equipment" to which plaintiff alludes in Count II, but not Count I, does not distinguish the two counts because it is subsumed within the "work scope or means or methods of performance."  Plaintiff also refers, in Count II of its complaint, to the Army having "delayed in engaging in adjustments for the Contract modification to place [plaintiff] under economic duress in order to improve Defendant's bargaining position."  Compl. ¶ 50.  However, if plaintiff proves the remaining facts that are alleged in Count II—that (1) the 438th AEW required (either directly or effectively) plaintiff to arm its personnel and (2) the Army failed to pay plaintiff for the resulting costs—it will prevail under Count I.  Count II would become superfluous because plaintiff seeks the same relief under both counts.  Therefore, Count II merges into, and is subsumed within, Count I.  Further, to the extent that the "economic duress" alleged in Count II distinguishes Count II from Count I, because it was not first presented to the contracting officer, the court would have no jurisdiction to consider it.

In sum, Count II of plaintiff's complaint merges into, and is subsumed within, Count I because both counts allege the same operative facts that, if proven, would result in the same relief.  Therefore, the court must grant defendant's motion to the extent that defendant seeks the merger of Count II into Count I.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

The court has jurisdiction to consider each count of plaintiff's complaint.  Further, Count II of plaintiff's complaint is duplicative of Count I.

Therefore, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion, and **MERGES** Count II into Count I.  Pursuant to RCFC 12(a)(4)(A), defendant is directed to file its answer with respect to Counts III and V **no later than Friday, August 10, 2018**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge